451 So.2d 706 (1984)
JESCO, INC.
v.
Gerald WHITEHEAD.
No. 53833.
Supreme Court of Mississippi.
February 29, 1984.
Rehearing Denied July 11, 1984.
*707 William M. Beasley, W.P. Mitchell, Mitchell, Eskridge, Voge, Clayton & Beasley, Tupelo, Darden, Sumners, Carter & Trout, New Albany, for appellant.
William S. Lawson, Tupelo, Talmadge Littlejohn, New Albany, Roscoe B. Hogan, William W. Smith, Birmingham, Ala., for appellee.
En Banc.
WALKER, Presiding Justice, for the Court:
This is an appeal from the Circuit Court of Lee County wherein the appellee, Gerald Whitehead, was awarded damages resulting from personal injuries received on December 22, 1977 when an explosion occurred in a grain mill operated by Sunshine Mills, Inc. (hereinafter referred to as Sunshine). Jesco, Inc. was an independent contractor performing work which required, among other things, welding on a grain conveyor and grain bin.
We reverse and remand for a new trial.
During the plaintiff's case in chief the plaintiff attempted to prove through *708 the testimony of an engineering expert, Phillip Lawson, that Jesco caused the explosion. The evidence presented by the plaintiff is largely uncontradicted except for the testimony of the experts. On December 22, 1977, an explosion occurred in the mill building operated by Sunshine. The four-story concrete building was being used by Sunshine to manufacture dog food at the time of the explosion. The first story of the building contained the main control panel for the production equipment. Also on the first floor of the mill building were the expander units, the weigh hopper for the mixer, and screw conveyors which feed grain into the weigh hopper. At the time of the explosion the conveyor lines had been turned on and were running. Plaintiff, Gerald Whitehead, was an employee of Sunshine. He was an expander operator and was approximately three or four feet away from the scales and mixing controls on the first floor at the time of the explosion.
For many years Jesco, a general contractor, had assisted Sunshine in building additions and making assorted alterations to the plant. On the day of the explosion Jesco employees were performing two separate jobs on the second floor of the building. Tommy May and Roger Hawkins had been assigned the task of building (cutting and welding) term spouts coming off the hopper of the grain bins. They had finished their work on two of the bins, the last having been completed at least thirty minutes before the explosion. Both bins were in full operation and grain had already refilled the bins above the area where the work had been performed. Jimmy Rickman and Jerry Thompson were assembling a screw conveyor in the middle of the second floor area at the time of the explosion. In the process of assembling the screw conveyor, Jerry Thompson had used the acetylene cutting torch to cut two bolt holes.
Phillip Lawson, the plaintiff's industrial engineer and expert witness, inspected the explosion site five days after the explosion occurred. On the second floor, twelve to fifteen feet from the area where Thompson and Rickman were working on the screw conveyor, Lawson found a burned hole in an acetylene hose. On top of the hose was a piece of sheet metal. Based on the fact that he found the burned hose under the sheet metal, Lawson theorized: (a) that in the process of cutting the bolt holes it was necessary for Jerry Thompson to pull the hose taut; (b) that when he pulled the hose against the adjacent metal, the edge of the metal cut the hose; (c) that acetylene gas leaked from the hole and spewed directly into dust assumed to be lying on the floor blowing the dust into a thick cloud; (d) that the acetylene gas and dust cloud were ignited by an unknown source creating a small explosion in the southwest corner twelve to fifteen feet from Rickman and Thompson; (e) that the small explosion shook the entire building, stirring up grain dust; (f) that the flame front from the first explosion ignited the stirred-up dust cloud on the east side of the second floor, creating the second big explosion which caused the major damage and the burns suffered by the plaintiff.
The theory testified to by Phillip Lawson, Whitehead's expert, was sharply contradicted by Jesco's witnesses who were on the second floor when the explosion occurred. They testified that the metal plates were not on the hose at the time of the explosion and that the explosion and fire did not originate on the second floor. They further testified that it was not necessary to pull the hose taut in order for them to perform their welding and cutting operations.
There was much evidence presented by Whitehead that Jesco had violated the Standard Fire Prevention Ordinance adopted by the City of Tupelo, which ordinance contained provisions directed toward the prevention of dust explosions. Whitehead charged and proved, inter alia, that Jesco had violated the City Ordinance by performing welding and cutting operations within thirty-five feet of combustible materials exposed to the operation; failed to have a fire watcher to watch for fires during the job and for thirty minutes after the *709 welding and cutting operations were finished; welding or cutting in or near rooms or locations where flammable dust was present; and performing welding or cutting on a container which had contained flammable solids without cleaning, inerting, or purging same.
The question presented in this case is whether Whitehead proved by a preponderance of the evidence that Jesco's negligence proximately contributed to the explosion and Whitehead's resulting injuries and damages. The jury found that it did.
However, after a meticulous combing and studying of this record and the briefs of able counsel, we are of the opinion that the verdict is contrary to the overwhelming weight of the evidence and that the judgment in favor of Whitehead against Jesco should be and is hereby set aside and a new trial ordered. In doing so, we have considered the cases cited by appellant, Jesco, urging that the case be reversed and rendered as well as those cited by appellee, Whitehead, urging that the case be affirmed. In our opinion justice demands another trial.
In remanding the case, we feel it is necessary to comment on several of appellant's assignments of error.

I.
The first question is whether the trial court erred in not instructing the jury that they must rely on the evidence presented by the plaintiff's expert witness, Phillip Lawson, as to the cause of the explosion if the plaintiff was to recover.
The primary thrust of Whitehead's case was that the hole in the acetylene hose line was caused by Jesco's employees' negligence and was the proximate cause of the explosion. However, it had been pled and there was presented to the jury throughout the case evidence that Jesco had violated several sections of the Ordinance of the City of Tupelo dealing with welding and cutting operations. Because of this evidence, we are unable to say that the trial court erred in refusing to grant Jesco's instruction DJ9A[1] and in granting Whitehead's instruction P7[2].
We do not find it necessary to comment on the testimony of Whitehead's other expert, Sims, offered on rebuttal, as this will, in all probability not occur again upon retrial.

II.
It was error for Whitehead's attorney to tell the jury in closing argument that all sums paid by the Workmen's Compensation insuror must be repaid before the plaintiff could receive anything out of any sum awarded by them. See Merchants Co. v. Hutchinson, 199 So.2d 813 (Miss. 1967).

III.
The court erred in granting the plaintiff an instruction, over defendant's objection, which permitted the plaintiff Whitehead to *710 recover for loss of future earnings without discounting the loss to its present worth.
Instruction P19 reads in pertinent part: Should your verdict be for Gerald Whitehead, you may consider the following factors in determining the amount of damages to be awarded as may be shown by a preponderance of the evidence: ... (6) Any future disability that is reasonably certain to occur, if any, its duration and its affect, if any, on Gerald Whitehead's future earning capacity. In arriving at the amount of your award, if any, for any loss of future earnings, you should consider what Gerald Whitehead's health, physical ability, age and earning power or capacity were before the injury and the effect of Gerald Whitehead's injuries, if any, upon them.
Appellant contends it was error to grant said instruction without advising the jury that any award for loss of future earning should be discounted to its present net cash value. Cf. Sheffield v. Sheffield, 405 So.2d 1314 (Miss. 1981). We agree.
The appellee admits it has long been the practice in this State to reduce lost future earnings to present net value; however, he asserts this method fails to account for inflation. He supports his contention by citing a Pennsylvania case, yet notes such is not binding in Mississippi.
The general rule as found in 22 Am.Jur.2d Damages section 96 states:
Thus, if the court, for this element of damages, awards a sum of money equal to the total decrease in plaintiff's earning capacity without reduction to present worth, it is ignoring the fact that money has the power to earn money. Damages should therefore be reduced to reflect only the present value of the plaintiff's decreased earning capacity. The plaintiff is not entitled to a sum of money, the interest on which compensates him for his decreased earning capacity, because this would leave the principal amount intact, resulting in over-compensation. The amount awarded should consider the use of both the principal and the interest as compensating for the decreased earning capacity. The goal of the personal injury award for this element of damages should be to give the plaintiff that sum of money which, if invested in reasonably safe investments, will return to the plaintiff the amount of the decrease in his earning capacity over the period of the injury if not permanent, or, if permanent, over the period of his life (or, according to some courts, work) expectancy prior to the injury and  at the termination of that period  be reduced to no value.
With regard to appellee's other contentions under this assignment, it was not necessary for Jesco to tender its own instruction after its specific objection to instruction P19 was overruled, nor did the granting of said instruction constitute harmless error as evidenced by the size of the award.
It is not necessary for us to address the remaining assignments of error in view of our holding that the case must be reversed and remanded for a new trial.

ON CROSS-APPEAL
The appellee, Whitehead, contends on cross-appeal that the trial court erred in refusing to instruct the jury that they could award punitive damages in addition to actual damages.
We find no merit in this contention. There is not a scintilla of evidence in this record that would support an award of punitive damages.
For the above stated reasons, this cause is reversed and remanded for a new trial on direct appeal and affirmed on cross-appeal.
REVERSED AND REMANDED FOR A NEW TRIAL ON DIRECT APPEAL AND AFFIRMED ON CROSS-APPEAL.
PATTERSON, C.J., ROY NOBLE LEE, P.J., and PRATHER and ROBERTSON, JJ., concur.
ROBERTSON, J., specially concurs.
*711 BOWLING, DAN M. LEE and SULLIVAN, JJ., dissent.
HAWKINS, J., not participating.
BOWLING, Justice, dissenting:
This probably should not be called a dissent. I think, however, that justice requires that I call the attention of the bench and bar to the situation existing between the case sub judice and a companion case being published this date. [Jesco, Inc. v. Shannon, 451 So.2d 694, both Whitehead and Shannon were employees of Sunshine Mills, working in the same vicinity in the mill. They were both horribly injured by the exact same set of circumstances at identically the same time. Nothing was different in the cause of the explosion. It was an explosion with one cause, the same as pulling the trigger of a gun and firing one shell or bullet that struck two people.
Something appears to me to be amiss when a judgment for one of the men is affirmed and the judgment for the other is reversed.
To me this is similar to a hypothetical as follows:
Assuming that John Doe and Richard Roe were riding in the back seat of a car. The driver in some manner ran off the road and hit a tree. One witness stated that in his opinion the speed of the car caused it to leave the road. The other witnesses stated that it was because the driver was not keeping a proper lookout  he was watching someone else on the sidewalk. The inescapable conclusion was that there was only one set of facts and everything involved was identical regardless of the opinion of the two witnesses. Something seems to be amiss with our judicial system then, if John Doe received compensation and Richard Roe did not.
We are affirming the case of Jesco, Inc. v. Shannon, an action with which I fully agree. We have no choice other than so to do as explained by Justice Prather in her opinion. We are reversing the case of Mr. Whitehead, who was seriously injured as previously stated in the exact same incident with no difference whatever in the facts as related in the hypothetical car accident above. I reiterate that this situation causes my eye-brows to raise and wonder how such a situation can develop under our legal jurisprudence. As we are affirming Shannon, I think it is the law of the case [or the incident] and Whitehead likewise should be affirmed.
DAN M. LEE and SULLIVAN, JJ., join in this dissent.
ROBERTSON, Justice, specially concurring:

I.
After considerable study, research and reflection, I concur in the judgment announced today.
Today we vacate what I understand to be the largest personal injury jury verdict and judgment in the history of the Courts of this State. Being aware of the importance of the case, the members of the Court to my certain knowledge have given it great care and attention. I personally know that my colleague, Presiding Justice Walker, who writes for the Court, has given the case long and intensive study. If anything, Justice Walker has gone the extra mile to assure that all facets of the case have been considered fairly and fully, not only by himself but by all other members of the Court.
I write separately not out of any reservation about the judgment reached but because, in my view, more need be said.

II.
The majority opinion provides a fair summary of the facts. Additional commentary, I believe, may make clearer the basis for today's decision.
From the evidence we know several things with certainty. An explosion did occur in the grain mill operated by Sunshine Mills. Gerald Whitehead received horrible and disabling personal injuries as a direct and proximate result of the explosion. *712 There is no evidence that Whitehead did anything which caused the explosion or his injuries; indeed, no one has even suggested such.
Elementary laws of physics posit three requisites for an explosion: (1) a combustible mixture, (2) containment, and (3) a source of ignition. Because we know that the explosion did occur, we know that it had some source of ignition. This source of ignition necessarily must have been attributable to the act(s) or omission(s) of some person or persons. Under the evidence before us, we know with reasonable certainty that this culprit or culprits must have been an agent(s) or an employee(s) of either Sunshine Mills, Inc. or of Jesco, Inc. Our search, de jure as well as de facto, for the igniting culprit narrows to two parties  Sunshine or Jesco. There was in law no Act of God here.
Our analysis to this point puts the case in an Eenie-Meanie-Minie-Mo posture. Was it Sunshine or was it Jesco? If the evidence fails to provide the contours of an answer, judgment must be entered for Jesco notwithstanding the verdict of the jury. We accordingly search the record for evidence and physical facts which make it more probable that Jesco was the culprit than Sunshine?
We regard four factors as being of critical importance here.
First, Plaintiff Whitehead offered at trial P.J. Lawson, an industrial engineer and expert witness. Justice Walker's opinion has outlined Mr. Lawson's hypothesis regarding causation. As that opinion makes clear, the Lawson theory is based upon a pyramiding, one upon the other, of six inferences, no one of which was proved directly. I regard this testimony as wholly insufficient to sustain a verdict for Whitehead. I accept without hesitation that "a measure of speculation and conjecture is required" in most judicial fact determinations. City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss. 1983). Mr. Lawson's theory, standing alone, contains much too much speculation and conjecture to support the verdict.
On the other hand, the Lawson theory is not wholly worthless. It is a possibility. The explosion could have happened as Lawson hypothesized. We find no credible evidence in the record establishing that the Lawson theory was a physical impossibility.
Second, we have the testimony of John Sims, a consulting engineer who was called in rebuttal by plaintiff. Sims was asked his opinion regarding the most likely place for the ignition to have occurred. Sims answer was:
The most likely place would be in the wheat bin itself. As the ground wheat is falling out of the hammermill, the most likely place we are going to see explosive mixtures of air and wheat dust are in the wheat bin itself.
The problem here is that Plaintiff let the matter drop at this point. Mr. Sims never spells out just how, in his expert opinion, the explosion could have begun in the wheat bin. Accordingly, standing alone, Mr. Sims' theory (if we may call it that) is insufficient to sustain the verdict returned by the jury.
On the other hand, we know from other testimony that just prior to the explosion Jesco employees had been welding on the wheat bin. Welding necessarily involves the release of sparks and other extremely hot matter which are capable of smoldering and then igniting. Without speculating exactly how the ignition may have occurred, we know that, if the explosion occurred in the wheat bin itself (as could have happened), on these facts the culprit almost certainly was Jesco. Sunshine employees did nothing on the day in question or at any other time which may have provided a source of ignition in the area of the wheat bin itself.
We thus have a second hypothesis, in and of itself too speculative and undeveloped to support the verdict, but nevertheless suggesting that Jesco is the culprit. Candidly, we regard the Sims "theory" as more sensible than that offered by P.J. Lawson. Indeed, if plaintiff had fully developed the *713 Sims theory, it may well have been sufficient to sustain the verdict in his favor.
The third factor we regard as significant is that the explosion did occur. And, as we have explained above, it must have been caused either by Sunshine or by Jesco. This cannot be overemphasized. We begin our consideration of the experts' theories knowing that either Sunshine or Jesco is the culprit. Without any expert testimony we know that (statistically speaking) there is a fifty-fifty chance that Jesco caused the explosion. When we add to this fifty-fifty balance the Lawson possibility and the Sims reasonable suggestion, the finger of fate begins to point ever so perceptibly toward Jesco.
Fourth, we cannot ignore the practical realities of litigating in the debris of the explosion of December 22, 1977. Rules of law regarding proof of negligence and causation have little discernible meaning in a vacuum. If they are to serve as instruments of justice  and for that purpose they have surely been designed  they must regard the practical realities of the tragedies of life to which they are to be applied.
With an explosion and resulting destruction such as that with which we are concerned here, it would be amazing if anyone could establish with certainty what caused it to happen. We know that Gerald Whitehead is innocent. Although under our law we quite properly require that a plaintiff such as Whitehead prove by a preponderance of the evidence that the defendant's negligence proximately caused his injuries, we allow the jury to consider a measure of speculation and conjecture even in automobile accident cases. See City of Jackson v. Locklar, supra, 431 So.2d at 478. The quality of speculation and conjecture allowable varies with the nature of the occurrence.
With the evidence in proper context, we turn to the issues before the Court.

III.
Following the jury's verdict, Jesco, Inc. timely filed a motion for j.n.o.v., or, in the alternative, for a new trial. Upon the denial of these motions by the circuit court, Jesco has perfected this appeal.
In its briefs and again at oral argument, Jesco's primary position is that it is entitled to judgment in its favor as a matter of law notwithstanding the verdict of the jury. In holding that a new trial should be held, the majority necessarily rejects this first of Jesco's assignments of error. En route to this action I would have preferred it had the majority set forth clearly the distinction between a motion j.n.o.v. and a motion for a new trial.[1] See, e.g., New Orleans and Northern Railroad Co. v. Burney, 248 Miss. 290, 299-300, 159 So.2d 85 (1963). Such in my view is necessary in order that the action we take today may be articulated on a reasoned basis and, hopefully, be so understood by the parties, the trial court, and other interested persons.
The motion for j.n.o.v. tests the legal sufficiency of the evidence supporting the verdict.[2] It asks the Court to hold, as a matter of law, that the verdict may not stand. Where a motion for j.n.o.v. has been made, the trial court must consider all of the evidence  not just evidence which supports the non-movant's case  in the light most favorable to the party opposed to the motion. The non-movant must also be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point so overwhelmingly in favor of the movant that reasonable men could not have arrived at a contrary verdict, granting the motion is required. On the other hand, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fairminded men in the exercise *714 of impartial judgment might reach different conclusions, the motion should be denied and the jury's verdict allowed to stand. See, e.g., General Tire and Rubber Co. v. Darnell, 221 So.2d 104, 105 (Miss. 1969); Paymaster Oil Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975); City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss. 1983).
The motion for a new trial is an altogether different animal. While a motion for judgment notwithstanding the verdict presents to the Court a pure question of law, the motion for a new trial is addressed to the trial court's sound discretion. That as a matter of law the motion for judgment notwithstanding the verdict must be overruled and denied in no way affects and little informs the trial judge regarding his disposition of the motion for a new trial.[3] Indeed, cases are hardly unfamiliar wherein the Court holds that the evidence is sufficient so that one party or the other was not entitled to judgment notwithstanding the verdict, but, nevertheless, that a new trial in the interest of justice should be ordered. See, e.g., Larkin v. Perry, 427 So.2d 138 (Miss. 1983).
A greater quantum of evidence favoring the party against whom the motion is made is necessary for that party to withstand a motion for a new trial as distinguished from a motion for j.n.o.v. Under our established case law, the trial judge should set aside a jury's verdict when, in the exercise of his sound discretion, he is convinced that the verdict is contrary to the substantial weight of the evidence. Mobile and Ohio Railroad Co. v. Bennett, 127 Miss. 413, 415, 90 So. 113 (1921); Columbus and Greenville Railway Co. v. Buford, 150 Miss. 832, 840, 116 So. 817 (1928); Odier v. Sumrall, 353 So.2d 1370, 1374 (Miss. 1978); Cf. Rule 5.16(2), Miss. Uniform Cr.R. of Cir.Ct. Practice. This is so even though he may have denied the motion for j.n.o.v. There is no inconsistency between a holding by the trial judge, first, that there is evidence in support of the verdict sufficient to require denial of the motion for j.n.o.v., while at the same time holding that the verdict is against the substantial weight of the evidence so that justice requires a new trial.
Having well in mind the distinction between the two motions  and particularly having in mind the Paymaster Oil standard elaborated above, I would affirm the trial court's judgment insofar as it denies Jesco's motion for j.n.o.v. The four factors mentioned above  the P.J. Lawson theory, the Sims theory, the inferences arising from the almost overlooked fact that this explosion did occur, coupled with the practical realities of reconstructing such an incident  point the finger perceptibly and adequately at Jesco. The evidence taken as a whole is not so overwhelming and one-sided that we can say with confidence that no hypothetical reasonable juror could, under our familiar test, find for Whitehead on liability.

IV
Whether Jesco is entitled to a new trial is another matter. Here we face the question traditionally phrased as whether the trial judge abused his discretion in refusing to hold that the verdict returned by the jury was on the liability issue contrary to the substantial weight of the evidence.[4] Through the following process, I would answer in the affirmative and, accordingly, join in the opinion of the majority.
I begin with an awareness that consideration of questions such as this must be had against the backdrop of constitutional mandate, for we find it provided in the fundamental law of our state that "the right of trial by jury shall remain inviolate, ..." Miss. Const. (1890) Art. 3, § 31. Beyond *715 that, the legislature has enacted that all questions of negligence and contributory negligence shall be for the jury to determine. Miss. Code Ann. § 11-7-17 (1972).
Neither constitution nor statute, however, have ever been considered to deny the trial courts of this state, and this Court on appeal, the authority to set aside jury verdicts on terms and grounds which were available at common law. In Beard v. Williams, 172 Miss. 880, 161 So. 750 (1935), we articulated the point:
We are conscious of the fact that the verdict of a jury is to be given great weight, and is the best means, when fair, of settling disputed questions of fact. Nevertheless, throughout the entire history of jury trials, the courts have exercised a supervisory power over them, and have granted new trials whenever convinced, from the evidence, that the jury has been partial or prejudiced, or has not responded to reason upon the evidence produced. The duty of the court in supervising trials by jury is such a vital part thereof that no court may refuse to exercise such power whenever fully convinced of its duty so to do. 172 Miss. at 884, 161 So. at 751.
A new trial does not deprive a litigant of his right to trial by jury. It merely requires that he submit to trial before a second jury.
Without going into an extended historical analysis, we regard it as accepted law that our trial courts have the authority to set aside a jury verdict, where, in the exercise of their sound discretion, they regard such a verdict as being contrary to the substantial weight of the evidence. See Rule 59(a)(1), Miss.R.Civ.P.; Cf. Rule 5.16(2), Miss. Uniform Cr.R. of Cir.Ct. Practice.
However much the trial of this or any other action ought to be a search for the truth, in the real world this cannot be. That we will never know the truth of what happened on December 22, 1977 I accept, though I do not like it.
The end of our litigation process must nevertheless be justice. That end is furthered when we apply to the facts demonstrably fair rules regulating primary private activity and providing remedies for civil injuries. That end is likewise furthered when the process is fair. Indeed, it may be argued that procedural fairness is the single most important component of justice in civil litigation.
The motion for a new trial has long been an element of our procedural system. We regard it as a necessary component of procedural justice in civil actions. It is employed in those rare cases when there would be injustice either in allowing the verdict to stand or in granting a j.n.o.v.
What is troublesome is that we tend to ignore that there must be some neutral, objective criteria which the trial judge must consider in determining whether this is one of those rare cases where a new trial, with all of its attendant trauma, delay, and expense, should be ordered. To be sure, no mechanical formula can be devised, nor should one be attempted. The twilight zone between granting a j.n.o.v. and allowing the verdict to stand is of imprecise contours, is filled with shades of gray. That it is difficult of identification in no way suggests that we be less than diligent in our attempts to delineate its boundaries or in our recognition of specific cases found well within those boundaries.
We ought not be content with such elusive formulations as "against the substantial weight of the evidence" or "against the overwhelming weight of the evidence". Such notions are empty vessels into which one may pour any content.
When passing on a motion for a new trial (after having denied a motion for j.n.o.v.), the trial judge should consider and weigh a number of factors. Among these are:
(1) Has the search for the true facts proceeded as far as it reasonably may under the peculiar facts and circumstances of the case? That the evidence supporting the verdict is incomplete and undeveloped, given what is reasonably practicable under the circumstances, should be a factor tending to support granting a new trial. On the other hand, if there is no reason to *716 expect that the parties can unmask the truth further at a new trial, the motion often should be denied.
(2) To what extent would it be unfair to the party in whose favor the verdict was returned in effect to give that party's adversary a second bite at the apple? A trial is a traumatic, expensive and time-consuming experience. Cf. Magee v. Griffin, 345 So.2d 1027, 1032 (Miss. 1977). Having successfully weathered its slings and arrows, a litigant has a substantial and legitimate interest that he will not be subjected to a repeat performance.
(3) Considering the evidence, is there a substantial basis for believing that the jury disregarded their oaths and failed to follow the instructions of the Court in reaching its verdict? Put another way, is it substantially apparent that the jury's verdict is the product of passion, prejudice or any other arbitrary factor? Most emphatically the trial judge should not have to think in terms of how he would have voted had he been a member of the jury. Rather he should consider whether it is substantially likely, considering the verdict in the light of the evidence, that the jurors did not fairly find the facts or apply the law.
(4) Assuming arguendo that the verdict is unjust (by reference to the underlying facts of the transaction or occurrence, the complete truth of which we will never know), what is the impact of that "injustice" upon the party against whom the verdict has been returned? Where that impact would be substantial, in view of an individualized consideration of the parties and the case, that should be a factor militating in favor of a new trial, and vice versa.
(5) If a new trial is ordered, will the party in whose favor the verdict has been returned be deprived of some fair advantage he enjoyed in the first trial? For example, if as here the verdict was for the plaintiff and if following the first trial a key witness has died, that may be a factor militating against ordering a new trial.
(6) Are there any other factors present, peculiar to the particular case or the parties, that would render just or unjust the grant or denial of a new trial?
When these factors are considered and weighed in the context of the case at bar, I regard it as an abuse of discretion that the trial judge did not grant Jesco's motion for a new trial.
The evidence on causation is unsettlingly incomplete. The Lawson theory and the Sims theory are seemingly at odds. Jesco persuasively pointed the finger at Sunshine through its own expert witnesses. Though there is not enough speculation and conjecture present to justify a j.n.o.v., there is too much to allow the verdict to stand. The enormity of the injustice to Jesco from an "incorrect" verdict is obvious.
To be sure Whitehead must endure another trial (although surely a pre-trial settlement is a reasonable possibility). We are not aware of any fair advantage he enjoyed at the first trial that would not be equally available at a new trial. No doubt the memory of witnesses may dim with time. With the available transcripts and discovery (from this trial and others within the judicial knowledge of this Court), refreshing the witnesses' memories for another trial should not be a significant problem.
On balance, I regard this as one of those clear cases in which a new trial most certainly should have been ordered.

V.
By today's judgment we have ordered a new trial. The trial judge erred in his failure to order a new trial. While the rules regarding the trial judge's discretion and authority are well-established, the point on appeal is a bit trickier. We sit as an appellate court, not as a trial court. We do not consider these matters de novo. Rather, our review is limited to an inquiry whether the ruling of the trial judge may be fairly characterized as an abuse of discretion.[5] See Dorris v. Carr, 330 So.2d *717 872, 873-74 (Miss. 1976); Taylor v. Washington Terminal Co., 409 F.2d 145, 147-48 (D.C. Cir.1969); Dupont v. Southern Pacific Co., 366 F.2d 193, 198 (5th Cir.1966); Morinville v. Morinville, 116 R.I. 507, 359 A.2d 48, 52-54 (1976).
Our review of a trial judge's exercise of discretion necessarily involves a substantial amount of discretion  and deference  on our part. In matters such as these we must always recognize that it is the trial judge who is on the scene. There is no way we could ever become as familiar with the proceedings at trial as the trial judge. Cf. Culbreath v. Johnson, 427 So.2d 705, 708 (Miss. 1983). We should give substantial weight, deference and respect to the decision of the trial judge in matters such as this.
On the other hand, we do not regard that we have the option of declining altogether review of the order of a trial judge denying a motion for a new trial. Such a position would be wholly inconsistent with our responsibilities as the court of last resort in this State. Where under all of the facts and circumstances of the case we are convinced clearly that the interest of justice requires a new trial and where we are further convinced clearly that the trial judge has abused his discretion in his refusal to grant a new trial, it becomes our duty to intervene. This, in my judgment, is the situation we have here.

VI.
In the end I candidly confess that subjective judgment cannot be excised from the inquiry we have here confronted. This is true when we consider the propriety of denial of judgment notwithstanding the verdict. It is certainly true in our review for abuse of discretion of the trial judge's denial of Jesco's motion for a new trial.
In cases such as this we make a judgment call. It will be ever thus. I only hope that the judgment call we make this day will be seen as having been as principled and unbiased as we have tried to make it.
My confession made, I concur
(a) that the Circuit Court correctly overruled Jesco's motion for judgment notwithstanding the verdict,
(b) that the Circuit Court's refusal to grant Jesco's alternative motion for a new trial constitutes an abuse of discretion, and
(c) that the judgment of the Circuit Court should be reversed and the case remanded for a new trial.
NOTES
[1] The court instructs the jury that you cannot return a verdict against the defendant, Jesco, Inc., on the basis of their actions in connection with welding on the corn bin and wheat bin.
[2] The court instructs the jury that at the time of the explosion at Sunshine Mills, the City of Tupelo had adopted by ordinance a Standard Fire Prevention Code, which contained provisions for the prevention of dust explosions, and also prescribed safety procedures for welding operations.

If you believe from a preponderance of the evidence presented in this case, that the defendant, Jesco, Inc., in conducting its welding operations at Sunshine Mills, violated the Standard Fire Prevention Code, by performing welding or cutting operations within 35 feet of combustible material exposed to the operation; failing to have a fire watcher to watch for fires during the job and at least 30 minutes after the welding or cutting operation is finished; welding or cutting in or near rooms or location where flammable dust is present; performing welding or cutting on a container which has contained flammable solids without cleaning, inerting, or purging same. And if you believe the aforesaid violations of this Code is such there were proximately caused or contributed to the injuries sustained by Gerald Whitehead, then the defendant Jesco, Inc., is guilty of actionable negligence and you shall so find.
[1] This distinction has been procedurally codified in the Mississippi Rules of Civil Procedure. The motion for j.n.o.v. is covered by Rule 50(b), while the motion for a new trial is authorized in Rule 59.
[2] The motion for a directed verdict at the conclusion of one's adversary's case, as well as the request for a peremptory instruction, serve a similar office.
[3] Conversely, where the motion for j.n.o.v. should be granted, the trial judge generally should conditionally grant a new trial. See Larkin v. Perry, 427 So.2d 138 (Miss. 1983).
[4] There are numerous other established bases on which new trials may be ordered. These include newly discovered evidence, trial errors in evidentiary rulings, errors in instructing the jury and no doubt many more. We are here concerned only with the motions grounded on the premise that the verdict is contrary to the substantial weight of the evidence.
[5] Professor Maurice Rosenberg has provided us with an insightful consideration of the entire subject of appellate review of trial court discretion. Rosenberg, Appellate Review of Trial Court Discretion, 79 F.R.D. 173 (1979); compare Dworkin, Taking Rights Seriously 31-39 (1977). In making this determination, we consider the same factors that a trial judge would when deciding whether to grant a new trial. It is merely our power to overturn his judgment, as limited by our scope of review, that is more restrictive.